IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| MATTHEW SELLS, | § | |
| (SPN # 28879-078) | § | |
| Movant, | § | |
| | § | |
| VS. | § | Crim No. 1:19-cr-00139-MAC-KFG-1 |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## MOTION FOR COMPASSIONATE RELEASE/REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, MATTHEW SELLS ("Sells"), appearing *pro se,* and respectfully moves the Court under 18 U.S.C. § 3582(c)(1)(A)(i) to modify his sentence and immediately release him to home confinement and a period of supervised release. The unprecedented threat of COVID-19 could not have been foreseen at sentencing, and poses extraordinary risks to Sells' health. The virus thrives in densely packed populations, and the USP is ill-equipped to contain the pandemic and prevent COVID-19 from becoming a de facto death sentence for Sells. Sells' diagnosed medical conditions make him especially vulnerable to the deadly risks of COVID-19. Allowing Sells to finish out his sentence at home is the only prudent response to the extraordinary and compelling circumstances created by the novel coronavirus.

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130

1

S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. **STATEMENT OF THE CASE**

### A.     **Procedural Background**

On September 4, 2019, a grand jury sitting in the United States District Court for the Eastern District of Texas, Beaumont Division, returned a one (1) count Indictment charging Sells. See Doc. 2.[1] Count 1 charged Sells with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). *Id.* The Indictment also contained a Forfeiture Allegation pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c). *Id.*

On January 14, 2020, a Change of Plea Hearing was held and Sells entered a plea of guilty on Count 1 of the Indictment, pursuant to a written Plea Agreement. See Doc. 19.

On July 9, 2020, Sells was sentenced to a total term 96 months' imprisonment, 3 years supervised release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100.00. See Docs. 32, 33.

On July 21, 2020, Sells timely filed a Notice of Appeal. Doc. 35.

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Eastern District of Texas, Beaumont Division in Criminal No. 1:19-cr-00139-MAC-KFG-1, which is immediately followed by the Docket Entry Number.

On July 13, 2021, the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") issued an Order dismissing Sells' appeal. See *United States v. Sells*, No. 20-40478 (5th Cir. July 13, 2021).

## B.    Statement of the Relevant Facts

### 1.    Offense Conduct

The United States and Sells, through the advise of his counsel, agreed to the following stipulated facts:

> Matthew Sells (Sells) was previously convicted of the following crimes punishable by imprisonment for a term exceeding one year: Possession of a Controlled Substance, in the Criminal District Court of Jefferson County, Texas, in case number 15-21957, on September 16, 2015; Unlawful Possession of a Firearm by a Felon, in the 252nd District Court of Jefferson County, Texas, in case number 15-23480, on September 23, 2016; Arson, in the Criminal District Court of Jefferson County, Texas, in case number 97613, on July 23, 2007, and Possession of a Controlled Substance, in the Criminal District Court of Jefferson County, Texas, in case number 93081, on March 9, 2007.

> On July 4, 2019, at approximately 2:31 p.m., in the Eastern District of Texas, Beaumont Police Department Officers Proenza and Leger performed a lawful traffic stop on a Jeep Grand Cherokee (the vehicle) driven by Sells.

> As Sells stopped the vehicle, he and several passengers exited and walked away.

> Officer Leger detained Sells and performed a lawful pat-down search. Officer Leger found a loaded pistol concealed in his Sells s front pant pocket. The firearm is described as one (1) Glock, Model 42, .380 caliber pistol, bearing serial number AAPU787.

> After Sells advised Officer Leger that there was another firearm in the vehicle, the officer found a pistol located in plain view on the rear passenger floorboard. The firearm is described as one (1) Century Arms International, Model C39V2, 7.62 caliber pistol bearing serial number C39P2A00018. The Century Arms pistol had a large capacity magazine attached to it containing 29 hollow-point bullets.

> Further investigation revealed that the Glock firearm was reported stolen to the Nederland Police Department.

An ATF firearm and nexus expert examined the firearms described above and determined that they were manufactured outside the State of Texas and, therefore, affected interstate commerce. The expert further determined that the firearms functioned as designed and were firearms within the meaning of 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845(a).

Sells agrees and stipulates that he knew of his prohibited status (i.e., that he was a felon) at the time of his possession of the firearms.

See Doc. 21 at 1-3.

### 2. Plea Proceeding

On January 14, 2020, a Change of Plea Hearing was held Magistrate Judge Zack Hawthorn. Sells pled guilty on Count 1 of the Indictment, pursuant to a written Plea Agreement. See Doc. 19. In exchange for Sells' guilty plea, the government agreed to recommend a three-level reduction for timely acceptance of responsibility.

### 3. Sentencing Proceeding

On July 9, 2020, a Sentencing Hearing was held before District Judge Marcia A. Crone. See Doc. 32. Sells was sentenced to a term 96 months' imprisonment, 3 years supervised release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100.00. See Docs. 32, 33. A timely Notice of Appeal was filed on July 21, 2020. See Doc. 35.

### 4. Appellate Proceeding

On Appeal, the Federal Public Defender appointed to represent Matthew Sells has moved for leave to withdraw and has filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *United States v. Flores*, 632 F.3d 229 (5th Cir. 2011). Sells has not filed a response. The Fifth Circuit reviewed counsel's brief and the relevant portions of the record reflected therein and concurred with counsel's assessment that the appeal presents no nonfrivolous issue for appellate review. Accordingly, counsel's motion for leave to withdraw was granted, counsel was excused from

5

further responsibilities herein, and the appeal was dismissed. See 5th Cir. R. 42.2. See *United States v. Sells*, No. 20-40478 (5th Cir. July 13, 2021).

### III. DISCUSSION

As a preliminary matter, Sells respectfully requests that this Court be mindful that *pro se* litigants are entitled to liberal construction of their pleadings. See *Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."); *Haines v Kerner*, 404 U.S. 519, 520 (1972).

### A. Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Sells' sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

#### 1. Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes

an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

### 2. Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

In 2007, the Sentencing Commission defined "extraordinary and compelling reasons" as follows:

(A)    Extraordinary and Compelling Reasons - Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the following circumstances:

   (i)    The defendant is suffering from a terminal illness.
   (ii)   The defendant is suffering from a permanent physical or medical condition, or is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self care within the environment of a correctional facility and for which conventional treatment promises no substantial improvement.
   (iii)  The death or incapacitation of the defendant's only family member capable of caring for the defendant's minor child or minor children.
   (iv)   As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason for purposes of subdivision (1)(A). USSG §1B1.13, Application Note 1.

As we will see, with the passage of The First Step Act, subparagraph (iv) is no longer limited by what the BOP decides is extraordinary and compelling.

Historically, the BOP rarely filed motions under §3582(c)(1)(A), even when the inmates met the objective criteria for modification. See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons Compassionate Release Program (Apr. 2013). The Office of the Inspector General also found that the BOP failed to provide adequate guidance to staff on the criteria for compassionate release, failed to set time lines for review of compassionate release requests, failed to create formal procedures for informing prisoners about compassionate release, and failed to generate a system for tracking compassionate release requests. *Id.* at i-iv.

Congress heard those complaints and in late 2018 enacted The First Step Act.

### 3. The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at §603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as ... improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

4.    Sells Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

On February 16, 2021, C. Gomez, Warden, USP McCreary, denied Sells' Request for Compassionate Release. Sells appealed the denial of his motion on March 3, 2021 but his appeal was denied on March 17, 2021. See Exhibit 1. Because the BOP failed to file a motion on Sells' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

## B.    **Sells' Current Conditions of Confinement and Health Conditions**

Sells, age 35, suffers from incurable, progressive disease, from which Sells will never recover, to wit: Asthma, Diabetes, and Hypertension. See Exhibit 2.

**Facts:**

*Asthma*. Asthma is a long-term disease of the lungs. You might hear your doctor call it a chronic respiratory disease. It causes your airways to get inflamed, narrow and swell, and produce extra mucus. This can make breathing difficult and trigger coughing, wheezing, shortness of breath, and chest tightness are classic asthma symptoms.

Asthma attacks can be fatal. A severe asthma attack can prevent you from getting enough oxygen into your lungs and can even stop your breathing. Therefore, severe asthma attack requires emergency medical attention.

*Hypertension*. Hypertension is another name for high blood pressure. It can lead to severe health complications and increase the risk of heart disease, stroke, and sometimes death.

Blood pressure is the force that a person's blood exerts against the walls of their blood vessels. This pressure depends on the resistance of the blood vessels and how hard the heart has to work.

10

Hypertension is a primary risk factor for cardiovascular disease, including stroke, heart attack, heart failure, and aneurysm. Keeping blood pressure under control is vital for preserving health and reducing the risk of these dangerous conditions.

***Diabetes***. Diabetes is a serious condition that causes higher than normal blood sugar levels. Diabetes occurs when your body cannot make or effectively use its own insulin, a hormone made by special cells in the pancreas called islets (eye-lets). Insulin serves as a "key" to open your cells, to allow the sugar (glucose) from the food you eat to enter. Then, your body uses that glucose for energy.

But with diabetes, several major things can go wrong to cause diabetes. Type 1 and type 2 diabetes are the most common forms of the disease, but there are also other kinds, such as gestational diabetes, which occurs during pregnancy, as well as other forms.

COVID-19 has infected hundreds of prisoners and staff in city jails, state prisons and federal prisons.

New York, California and Ohio were among the first to release incarcerated people. Other states have followed, saying it is the only way to protect prisoners, correctional workers, their families and the broader community.

Jails and prisons often lack basic hygiene products, have minimal health care services and are overcrowded. Social distancing is nearly impossible except in solitary confinement, but that poses its own dangers to mental and physical health.

While there is absolutely no evidence to support that any person is more or less likely to be infected [with COVID-19] based on existing medical conditions, Sells' argues that, first, prisoners experience exponentially higher rates of COVID-19 than the general population. As of June 2020, "[t]he COVID-19 case rate for prisoners was 5.5 times higher than the US population case rate."[2] Second, and more critically, older individuals and individuals with chronic medical conditions are

---

2

Brendan Saloner, *et al.*, *COVID-19 Cases and Deaths in Federal and State Prisons*, J. of the Am. Med. Ass'n (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

at greater risk of hospitalization and death from COVID-19. For example, the CDC reports that persons aged 40 to 49 are 15 times more likely to be hospitalized and 130 times more likely to die from COVID-19 compared to persons aged 18 to 29 and younger.[3] In other words, Sells does not only contend that his health conditions increase his risk of getting COVID-19; but also, he contends that those conditions greatly increase the risk that, if contracted, his COVID-19 infection would be severe or even deadly.

### *BOP Amid Covid-19*

One consequence of overcrowding is that prison officials have a difficult time providing adequate health care.

In 2011 the U.S. Supreme Court ruled that overcrowding undermined health care in California's prisons, causing avoidable deaths. The justices upheld a lower court's finding that this caused an "unconscionable degree of suffering" in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

Amid a worldwide pandemic, such conditions are treacherous. Some of the worst COVID-19 outbreaks in U.S. prisons and jails are in places – like Louisiana and Chicago – whose prison health systems have been ruled unconstitutionally inadequate. Criminologists and advocates say many more people should be released from jails and prison, even some convicted of violent crimes if they have underlying health conditions.

The decision to release prisoners cannot be made lightly. But arguments against it discount a reality recognized over two centuries ago: The health of prisoners and communities are inextricably

---

[3]

*Hospitalizations & Death by Age*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (last updated May 14, 2021).

linked. Coronavirus confirms that prison walls do not, in fact, separate the welfare of those on the inside from those on the outside.

## C. Sells Has "Extraordinary and Compelling Reasons" For Compassionate Release

The principles of Compassionate Release allow for Sells' early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

### 1. COVID-19 Is a Public Health Disaster That Threatens Vulnerable Incarcerated Persons like Sells.

The COVID-19 pandemic continues to roil the United States. As of April 29, 2021, the BOP has 126,247 federal inmates in BOP-managed institutions and 13,636 in community-based facilities. The BOP staff complement is approximately 36,000. There are 352 federal inmates and 815 BOP staff who have confirmed positive test results for COVID-19 nationwide. There have been 234 federal inmate deaths and 4 BOP staff member deaths attributed to COVID-19 disease. See https://www.bop.gov/coronavirus/ (last accessed April 29, 2021). Bottom line, Federal facilities are not immune.

Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells, eat together and use the same bathrooms and sinks. . . . . They are not given tissues or sufficient hygiene supplies"); Joseph A. Bick (2007). *Infection Control in Jails and Prisons*. Clinical Infectious Diseases 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of

13

transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). BOP employees are complaining that they lack masks and gloves, hand sanitizer, and even soap.

"The [BOP] management plan itself acknowledges [that] symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. . . . We don't know who's infected." *Manrique*, 2020 WL 1307109, at *1.10

Indeed, as the Second Circuit recently observed, present information about the COVID-19 epidemic and the BOPs' prior failings in 2019 to adequately protect detainees and allow them access to counsel and their families following a fire and power outages suggest that the virus' impact will likely be "grave and enduring." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

> ## 2. Sells' Vulnerability to COVID-19 Due to His High Medical Risk Is an Extraordinary and Compelling Reason That Warrants a Sentence Reduction.

Sells is particularly vulnerable to COVID-19 because of his asthma, diabetes, and hypertension. As the COVID-19 pandemic continues, it potentially poses a particular issue for older people and people with pre-existing medical conditions (such as serious heart condition, lung disease, and autoimmune disease) appear to be more vulnerable to becoming severely ill with the COVID-19 virus.

> *Lung Problems, Including Asthma*
> COVID-19 targets the lungs, so you're more likely to develop severe symptoms if you have preexisting lung problems, such as: Moderate to severe asthma, Chronic obstructive pulmonary disease (COPD), Lung cancer, Cystic fibrosis, Pulmonary fibrosis. In addition to being an asthma trigger, smoking or vaping can harm your

lungs and inhibit your immune system, which increases the risk of serious complications with COVID-19.

## Heart Disease, Diabetes and Obesity

People with diabetes, heart disease, high blood pressure or severe obesity are more likely to experience dangerous symptoms if infected with COVID-19. This may be of particular concern in the United States, which has seen increasing rates of obesity and diabetes over the years.

Obesity and diabetes both reduce the efficiency of a person's immune system. Diabetes increases the risk of infections in general. This risk can be reduced by keeping blood sugar levels controlled and continuing your diabetes medications and insulin. Your risk of serious illness may also be higher if you have heart diseases such as cardiomyopathy, pulmonary hypertension, congenital heart disease, heart failure or coronary artery disease.

## How SARS-COV-2 Causes Disease and Death in COVID-19

"You'd think underlying lung problems or immune system problems will be the greatest risk," says Dr. Levitt. "But it seems the biggest risk factors have been hypertension, diabetes and obesity." That has led many scientists to suspect that the profound inflammation seen in severe cases of COVID-19 may be yet another problem linked to SARS-COV-2's fondness for ACE2. People with diabetes, hypertension and heart disease have more ACE2 on their cells as a response to the higher levels of inflammation that come with their condition; ACE2 has an anti-inflammatory effect. When SARS-COV-2 sticks to ACE2 and reduces its ability to do its job, the underlying inflammation gets worse.

When inflammation gets completely out of control the body enters what is called a cytokine storm. Such storms drive the most severe outcomes for COVID-19, including multi-organ failure. There is thus an obvious role for anti-inflammatory drugs. But knowing when to administer them is hard. Go too late, and the storm will be unstoppable; go too early, and you may dampen down an immune response that is turning the tide. A recent article in the Lancet suggests that it would help if COVID-19 patients were routinely screened for hyper-inflammation to help identify those who might benefit from anti-inflammatory drugs. But not everyone is convinced today's drugs have much to offer. "We tried [a range of anti-inflammatory treatment] and it actually didn't work," says Rajnish Jaiswal, who has been working on the front line of COVID-19 treatment at New York's Metropolitan Hospital.

https://www.economist.com/briefing/2020/06/06/how-sars-cov-2-causes-disease-and-death-in-covid-19.

## *Delta Plus Variant of COVID-19*

The latest coronavirus variant has spread to about a dozen countries—including India, the U.S., and the U.K.—while scientists scramble to figure out if the strain is more deadly or transmissible.

A new variant of the coronavirus has emerged, and scientists are working to figure out if it is more dangerous than its infamous cousin, the Delta variant, which has killed hundreds of thousands of people in India and is fast becoming the dominant variant around the world.
The state of Maharashtra, India, which was hit hard by the devastating second wave of COVID-19, has now reimposed lockdowns due to rising fears about this new variant, dubbed Delta Plus (which is not an official designation).

Delta Plus differs just slightly from Delta—the predominant strain in India and the United Kingdom—which is more infectious and is thought to cause more hospitalizations than previous strains. Existing vaccines are effective against Delta, but only when people are fully vaccinated.

Out of an abundance of caution, the World Health Organization has urged fully vaccinated people to continue wearing masks. "Once you've been fully vaccinated, continue to play it safe because you could end up as part of a transmission chain. You may not actually be fully protected. Sometimes the vaccines don't work," Bruce Aylward, WHO senior adviser, said at a news conference last week.

The Delta Plus variant began appearing in global databases after mid-March, and by April 26 cases were found in England, prompting the United Kingdom to ban international travel on June 4. However, several patients with no history of travel or contact with travelers got infected with Delta Plus, which suggests the variant had begun to circulate in the U.K. through community spread. While the variant isn't yet common, the Indian Health Ministry designated Delta Plus a Variant of Concern (VOC) on June 22, citing its perceived increased transmissibility, ability to bind more strongly to receptors on lung cells, and potential to evade an antibody response.

But whether Delta Plus meets the threshold for VOC designation is unclear. "India called it a VOC out of caution rather than any hard data," says Ravindra Gupta, an immunologist and infectious diseases specialist at University of Cambridge.

When a variant becomes frequent and displays worrying traits, public health authorities initiate a formal investigation, designating it as a Variant Under Investigation (VUI). If it is found to be more transmissive, more resistant to antibodies, or to cause more severe disease, the variant is designated a VOC.

16

The Indian SARS-CoV-2 Genomic Consortium (INSACOG), a country wide network of laboratories and government agencies that monitors variations in the genetic code of coronavirus, actually described Delta Plus as a Variant of Interest, not a VOC, says virologist Shahid Jameel, who until recently led INSACOG's scientific advisory group. But, argues Jameel, the new mutation would not have made the Delta Plus less transmissible than Delta, or reduced the virus's ability to escape the immune response. "Hence there is nothing wrong with designating Delta Plus also a Variant of Concern," he says.

Now at least two versions of the Delta Plus variant are slowly spreading around the world. The variant has been detected in Canada, Germany, Russia, Switzerland, Poland, Portugal, Nepal, Japan, the U.K., and the U.S. The more Internationally prevalent version is designated "AY.1", while "AY.2" is confined mostly to the U.S. Delta Plus has already been detected 150 times in the U.S.

Existing vaccines still work against the original Delta variant but are **less effective, especially among people who might not mount an effective immune response after vaccination, are older, or whose protection may wane faster**. A single dose of the Pfizer or the AstraZeneca vaccine was only 33 percent effective against symptomatic disease caused by Delta variant. After both doses, the AstraZeneca vaccine was 60 percent effective, and the effectiveness of the Pfizer jab rose to 88 percent. New early research suggests that Moderna's vaccine is less efficacious against the Delta variant and Johnson & Johnson is only about 60 percent effective.

But in Israel, where 57.1 percent population is fully vaccinated, about half of Delta variant infections occurred among those fully vaccinated with the Pfizer shots. This prompted Israel to reinstate wearing masks indoors.
"In terms of variants ... we know vaccines work; we know that masking and social distancing work. As scary as it looks, we still have measures to counter it," says Priyamvada Acharya, an immunologist at Duke Human Vaccine Institute.

Delta Plus differs from Delta because of an extra mutation—K417N—located in the spike protein, which covers the surface of the SARS-CoV-2 virus. This same location is mutated in other VOCs: Beta (first identified in South Africa) and Gamma (first identified in Brazil). The K417 mutation has also been detected in some samples of Alpha (first identified in UK).

The K417 position is within the region of the spike protein that interacts with the ACE2 receptor protein and enables the virus to infect cells—including those in the lung, heart, kidney, and intestine. When the spike protein encounters ACE2, it transforms from a "closed" to an "open" state to bind to the receptor and infect the cell. Based on studies of the Beta variant, which carries this same mutation, K417N can help the spike reach the fully "open" state, which likely increases its ability to

infect. Increased ACE2 receptor binding and a more open state are traits of other highly transmissive and antibody resistant variants.

Studies show that mutations at the K417 location help the Beta variant evade antibodies, so that could mean Delta Plus may dodge vaccines and antibodies even better than Delta.

"In the Delta variant lineage, the presence of the K417N mutation detected in some cases is a strong indicator that the variant may evolve to be more resistant to neutralizing antibodies," speculated Olivier Schwartz, head of the Virus and Immunity Unit at Institut Pasteur in France. Schwartz's early research has shown (in studies that have not yet been peer reviewed) that Delta is less vulnerable to antibodies extracted from the blood of convalescent and vaccinated individuals.

But the incremental effect of K417N on the viral spike protein that distinguishes Delta Plus from Delta is not easy to predict, because impact of individual mutations on proteins cannot simply be added together.

See https://www.nationalgeographic.com/science/article/how-dangerous-is-the-new-delta-plus-variant--heres-what-we-know.

The dangerous Delta variant of the coronavirus is spreading so quickly in the United States that it's likely the mutant strain will become predominant in the nation within weeks, according to federal health officials and a new analysis.

At a White House briefing on COVID-19 on Tuesday, Dr. Anthony Fauci of the National Institutes of Health said 20.6% of new cases in the U.S. are due to the Delta variant. And other scientists tracking the variant say it is on track to become the dominant virus variant in the U.S.

"The Delta variant is currently the greatest threat in the U.S. to our attempt to eliminate COVID-19," Fauci said. He noted that the proportion of infections being caused by the variant is doubling every two weeks.

The variant, first identified in India, is the most contagious yet and, among those not yet vaccinated, may trigger serious illness in more people than other variants do, he said.

See https://www.npr.org/sections/health-shots/2021/06/22/1008859705/delta-variant-coronavirus-unvaccinated-u-s-covid-surge.

Hence, it is appropriate for Sells to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

**Note:** According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.

    a.    Based on what we know now, those at high-risk for severe illness from COVID-19 are:
- People 60 years and older
- People who live in a nursing home or long-term care facility

    b.    People of all ages with underlying medical conditions, particularly if not well controlled, including:
- Cancer
- Chronic kidney disease
- Chronic lung diseases, including COPD (chronic obstructive pulmonary disease), asthma (moderate-to-severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension
- Dementia or other neurological conditions
- Diabetes (type 1 or type 2)
- Down syndrome
- Heart conditions (such as heart failure, coronary artery disease, cardiomyopathies or hypertension)
- HIV infection
- Immunocompromised state (weakened immune system)
- Liver disease
- Overweight and obesity
- Pregnancy
- Sickle cell disease or thalassemia
- Smoking, current or former
- Solid organ or blood stem cell transplant
- Stroke or cerebrovascular disease, which affects blood flow to the brain
- Substance use disorders

are the hallmark of those who are most endangered by the instant pandemic. These are "extraordinary and compelling reasons" for his release. See Note 1(A), § 1B1.13 (expressly recognizing that "other reasons" may exist for granting compassionate release), see Note 1(D), § 1B1.13 Note 1(D) (recognizing that extraordinary and compelling reasons exists "other than, or in combination with, the reasons described in subdivisions (A) through (C)."). Here, Sells' high susceptibility to COVID-19 falls within the purview of this catchall. Moreover, courts have noted that while § 1B1.13 provides "helpful guidance" for determining what constitutes an extraordinary and compelling reason to warrant a sentence reduction, the inquiry does not end there. Rather, district courts have the freedom to shape the contours of what constitutes an extraordinary and compelling reason to warrant compassionate release. Given the highly infectious nature of COVID-19, the inability in a facility like BOP to practice any of the hygienic and social distancing techniques that the Center for Disease Control has put in place to prevent rapid transmission, and the fact that Sells suffers from ailments that have already been identified as "high risk," this Court should find that Sells' legitimate medical risk is a sufficiently extraordinary and compelling basis for granting compassionate release.

A recent letter by fourteen U.S. senators of both parties underscores this position. Writing to U.S. Attorney General William Barr and BOP Director Michael Carvajal, they stated: "[We] urge you to take necessary steps to protect [inmates in Federal custody] particularly by using existing authorities under the First Step Act (FSA). . . . We have reviewed the Federal Bureau of Prisons (BOP) COVID-19 Action Plan, which . . . notably does not include any measures to protect the most vulnerable staff and inmates. . . . [I]t is important . . . that the most vulnerable inmates are released or transferred to home confinement, if possible." And as the Second Circuit noted about COVID-19 in a unanimous recent opinion, "The impact of this recent emergency on jail and prison inmates, their

counsel . . . , the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring." *Fed. Defs. of New York, Inc.*, 2020 WL 1320886, at \*12.

Finally, in the last few months, other jails and prisons have already started to proactively release elderly and sick inmates who are at high risk of infection, as well as releasing as many nonviolent offenders as possible in an effort to reduce the incarcerated population and thus reduce the risk of spread. For example, on March 25, 2020, New York City announced that it would release 300 inmates from Rikers Island. Approximately 1,700 inmates have been released from Los Angeles County Jails, and 1,000 inmates are to be released from New Jersey jails. Therefore, while COVID-19 remains an unprecedented emergency, many states (and politicians) have recognized that they have a duty to flatten the curve inside incarcerated spaces. So, too, should this Court.

3. Courts Have Granted Compassionate Release in Light of the Instant Pandemic.

Courts in the Southern and Eastern Districts of New York have granted compassionate release based on COVID-19. See *United States v. Wilson Perez*, No. 17 Cr. 513 (AT) (S.D.N.Y. Apr. 1, 2020), ECF No. 98, (granting release based on health issues and finding court could waive exhaustion requirement; government did not object based on defendant's medical conditions); *United States v. Mark Resnick*, No. 12 Cr. 152 (CM) (S.D.N.Y. April 2, 2020), ECF No. 461 (granting compassionate release because of defendant's age and medical conditions in light of COVID-19); *United States v. Eli Dana*, No. 14 Cr. 405 (JMF) (S.D.N.Y. Mar. 31, 2020), ECF No. 108 (granting compassionate release motion, where government consented, because of defendant's

age and medical conditions and the risk posed by COVID-19); *United States v. Damian Campagna*, No. 16 Cr. 78 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020) (granting compassionate release sentencing reduction to defendant convicted of firearms offenses based on defendant's health and threat he faced from COVID-19; government consented to reduction and agreed health issues and COVID-19 were basis for relief); *United States v. Daniel Hernandez*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Apr. 1, 2020), ECF No. 446 (granting compassionate release after BOP denied the request and converting remaining sentence to home confinement).

So, too, have courts across the country. See *United States v. Andre Williams*, No. 04 Cr. 95 (MCR) (N.D. Fla. Apr. 1, 2020) (granting release based on defendant's health and COVID-19); *United States v. Teresa Ann Martin*, No. 18 Cr. 232 (TOR) (E.D. Wa. Mar. 25, 2020), ECF No. 834 (waiving any further exhaustion attempts as futile and granting compassionate release based on defendant's health issues and COVID-19 pandemic); *United States v. Jeremy Rodriguez*, No. 03 Cr. 271 (AB) (E.D. Pa. Apr. 1, 2020), ECF No. 135 (finding court has independent authority to determine "extraordinary and compelling" reasons and granting compassionate release based in part on defendant's health and COVID-19; no exhaustion issue because 30 days had passed); *United States v. Pedro Muniz*, No. 09 Cr. 199 (S.D. Tex. Mar. 30, 2020), ECF No. 578 (granting compassionate release based on health conditions that made inmate susceptible to COVID-19); *United States v. Samuel H. Powell*, No. 94 Cr. 316 (ESH) (D.D.C. Mar. 27, 2020), ECF No. 97 (granting compassionate release for 55-year old defendant with respiratory problems in light of outbreak, without waiting for 30 days or other exhaustion of administrative remedies through the BOP); *United States v. Agustin Francisco Huneeus*, No. 19 Cr. 10117 (IT) (D. Mass. Mar. 17, 2020), ECF No. 642 (granting defendant's emergency motion based on COVID-19); *US v. Foster*, No.

22

1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) ("The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment 'extraordinary and compelling,' and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "not expected to recover." USSG §§ 1B1.13. No rationale is more compelling or extraordinary."); *US v. Powell*, No. 1:94-cr-0316-ESH (D.D.C. Mar. 24, 2020), Recommendation, Dkt. 94 (Court recommendation to BOP to immediately place defendant, who is 55-years old and suffers from several respiratory problems (including asthma and sleep apnea) into home confinement to serve the remainder of his prison term); *United States v. Watkins*, Case No. 15-20333 (E.D. Mich. Jul. 16, 2020), granting compassionate release to prisoner whose only underlying condition was previously-treated latent TB; and *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366, at *10 (N.D. Cal. Apr. 20, 2020) (granting release from immigration custody for petitioner with latent TB, hypertension, and obesity); and *United States v. Gerard Scparta*, No. 18 Cr. 578 (AJN), ECF Dkt. 69 (S.D.N.Y. Apr. 19, 2020). In *Scparta*, Judge Nathan granted a compassionate release motion of a 55-year old defendant who suffers from high blood pressure, high cholesterol, sleep apnea, and hypertension. The court found that it could waive § 3582(c)(1)(A)'s 30-day waiting period and hear the motion, and describes USP Butner's "Kafkaesque" "14-day quarantine" process—which is neither a true "quarantine" nor actually limited to 14 days—before releasing inmates to home confinement.

### 4. Sells' Remarkable Rehabilitation

It is essential to also note that since Sells' incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." See Exhibit 3. Throughout the time

23

he has spent in prison, Sells has worked long and hard and diligently at his rehabilitation. Hence, there can be no genuine safety concerns on his release. His extraordinary rehabilitation shows that he is ready for re-entry.

Sells urges the Court to consider the following *Redd* case citations:

- *United States v. Carpenter*, 2:14-CR-00309-TLN, 2020 WL 5851129 (E.D. Cal. Sept. 30, 2020) in which the court initially denied the defendant's request for compassionate release but later granted on a motion for reconsideration after observing that cases within defendant's facility had increased and that the defendant was herself diagnosed with COVID-19.

- *United States v. Belanger*, 1:15-CR-00072-JDL, 2020 WL 5351028 (D. Me. Sept. 4, 2020), which granted release for a defendant at risk of severe COVID after he had served approximately 30% of a 132-month sentence.

- *United States v. Grant*, 16-30021-001, 2020 WL 4036382 (C.D. Ill. July 17, 2020) which specifically recognized that osteomyelitis may pose a serious health risk despite not being specifically named by the CDC as a COVID-19 risk factor.

- *United States v. Pabon*, 458 F. Supp. 3d 296, 299 (E.D. Pa. 2020) which granted defendant compassionate release after serving 14 months of a 46-month sentence because "continued incarceration might interfere with his ability to get needed medical care" for hypertension, diabetes, and other medical conditions.

And

- *United States v. Crowe*, 980 F.3d at 1102 n.6 (holding that inmate's prior exposure to tuberculosis "could be considered an extraordinary and compelling reason for compassionate release" because it "put him at risk of contracting the virus" or "serious long-term health problems" if he had already contracted it). Courts considering the issue post-*Jones* have agreed. See, e.g., *United States v. Rucker*, No. 17-20716, 2020 WL 7240900, at *2 (E.D. Mich. Dec. 9, 2020) (HIV and asthma) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. White*, No. 18-20183, 2020 WL 7240904, at *3 (E.D. Mich. Dec. 9, 2020) (BMI of 45.9) (citing *Jones*, 980 F.3d at 1102 n.6); *United States v. Crowe*, No. CR 11-20481, 2020 WL 7185648, at *3 (E.D. Mich. Dec. 7, 2020) (latent tuberculosis, hyperlipidemia, obesity).

24

- Section 1B1.13 has not been updated to reflect pursuant to the 2018 First Step Act, hence, defendants now have the ability to bring such motions directly. This anomaly has given rise to a debate concerning whether and to what extent § 1B1.13 applies to motions filed by defendants, with several circuits recently holding that § 1B1.13 applies only to motions filed by the Bureau of Prisons, and not to motions filed by defendants on their own behalf. See *United States v. McCoy*, Nos. 20-6821, 20-6869, 20-6875, 20-6877, 2020 WL 7050097, at *6-7 (4th Cir. Dec. 2, 2020); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *8-9 (6th Cir. Nov. 20, 2020); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020); *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).

Factoring in Sells' rehabilitation and impeccable conduct in prison, his continued risk to the public if released appears to be markedly reduced, particularly when tempered by significant rehabilitation. Given his personal rehabilitation, and deeply felt remorse, the Court must conclude that deterrence and public protection are no longer strong § 3553(a) factors weighing in favor of continued detention.

Under 18 U.S.C. § 3582(c)(2), to modify Sells' sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Additionally, Sells also contends that evidence of his post-sentencing rehabilitation warrants a reduction. More so, his BOP record does not show that he is violent or a threat to public safety.

Finally, the combination of factors, health conditions, COVID-19 risk, as well as post-sentencing rehabilitation, and the changing sentencing landscape justify granting compassionate release to Sells. More so, his BOP record does not show that he is violent or a threat to public safety.

## IV. **CONCLUSION**

For the above and foregoing reasons, this Court should grant Sells' Motion for

Compassionate Release/ Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First

Step Act of 2018, based upon the fact that he has exhausted his administrative remedy and he has

met the "extraordinary and compelling reasons" for reducing his sentence to time served.

Respectfully submitted,

Dated: July⊃⊋ 2021

MATTHEW SELLS
REG. NO. 28879-078
USP MCCREARY
U.S. PENITENTIARY
P.O. BOX 3000
PINE KNOT, KY 42635
Appearing *Pro Se*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July⊃⊋, 2021, I mailed a true and correct copy of the above and
foregoing Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. §
3582(c)(1)(A) and the First Step Act of 2018 via U.S. Mail, postage prepaid, to John Bulkley Ross,
Assistant U. S. Attorney at U.S. Attorney's Office, 350 Magnolia, Suite 150, Beaumont, TX
77701-2237.

MATTHEW SELLS

**EXHIBIT 1:**
**"Administrative Remedies"**



## Part B - Response

This is in response to your Request for Administrative Remedy received in this office on March 3, 2021, in which you are appealing the February 16, 2021, denial of your request for Compassionate Release.   A review into this matter reveals you are not appropriate for Compassionate Release due to your high recidivism risk score and history of violence.

Title 18 of the United States Code, section 3582(c)(1)(A), allows a sentencing court, on motion of the Director of the BOP, to reduce a term of imprisonment for extraordinary or compelling reasons.   BOP Program Statement 5050.50, <u>Compassionate Release/Reduction in Sentence,</u> states Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate with medical conditions, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner.   Your request has been evaluated consistent with this general guidance.

The BOP is taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates. We recognize that you, like all of us, have legitimate concerns and fears about the spread and effects of the virus. However, your concern about being potentially exposed to, or possibly contracting, COVID-19 does not currently warrant an early release from your sentence.

Accordingly, the response to your Request for Administrative Remedy is denied. If you are dissatisfied with this response, you may appeal to the Regional Director, Mid-Atlantic Regional Office, 302 Sentinel Drive, Suite 200, Annapolis Junction, MD   20701. Your appeal must be received in the Regional Office within 20 days from the date of this response.

_____
C. Gomez, Warden

_____
Date   3/17/21

# REQUEST FOR ADMINISTRATIVE REMEDY

Delivered to inmate
by: MAR 17 2021

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

## Part A– INMATE REQUEST

_____

| DATE | SIGNATURE OF REQUESTER |

## Part B– RESPONSE

RECEIVED

MAR – 3 2021

USP McCreary
Warden's Office

_____

| DATE | WARDEN OR REGIONAL DIRECTOR |

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

SECOND COPY: RETURN TO INMATE                CASE NUMBER: _____

CASE NUMBER: _____

## Part C– RECEIPT

Return to: _____

| LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

SUBJECT: _____

_____

| DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) |

BP–229(13)
APRIL 1982
USP LVN

**EXHIBIT 2:**
**"Medical Documents"**

**Bureau of Prisons**
**Health Services**
**Health Problems**

Reg #: 28879-078                      Inmate Name: SELLS, MATTHEW

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Current** | | | | | | |
| Type 2 diabetes mellitus | | | | | | |
| 12/29/2020 08:02 EST  Cunnagin, Carrie DO | | ICD-10 | E119 | 12/29/2020 | Current | |
| DKA 12/29/2020 per ER | | | | | | |
| 12/29/2020 07:47 EST  Kenney, Pamela FNP | | ICD-10 | E119 | 12/29/2020 | Current | |
| DKA per ER | | | | | | |
| 12/29/2020 07:42 EST  Kenney, Pamela FNP | | ICD-10 | E119 | 12/29/2020 | Current | |
| Encounter for exam for admission to prison without abnormal findings | | | | | | |
| 12/10/2020 11:41 EST  Kenney, Pamela FNP | | ICD-10 | Z022 | 12/10/2020 | Current | |

Total: 2

| Complex: | MCR--MCCREARY USP | Begin Date: | N/A | End Date: | N/A |
|---|---|---|---|---|---|
| Inmate: | SELLS, MATTHEW | Reg #: | 28879-078 | Quarter: | A03-124U |

**Medications listed reflect prescribed medications from the begin date to end date on this report.**

Allergies:                              Denied

## Active Prescriptions

Losartan potassium  50 MG Tab
Take one tablet (50 MG) by mouth daily
**Rx#:**  202933-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 30 TAB in 44 days

metFORMIN HCl 1000 MG Tab
Take one tablet (1000 MG)  by mouth two times a day -- start after the 7 days of 500 mg is completed
**Rx#:**  202934-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 60 TAB in 44 days

Vitamin A & D Ointment  60 GM
Apply a small amount topically to the affected area(s) twice daily feet **non-formulary approved until: 01/20/2023
**Rx#:**  203235-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 0 GM in 44 days

Insulin  NPH (10 ML) 100 UNITS/ML INJ
inject 27 units of NPH insulin subcutaneously each morning ***pill line***
**Rx#:**  202929-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 0 ML in 44 days

Insulin  NPH (10 ML) 100 UNITS/ML INJ
Inject 11 units of NPH insulin subcutaneously each evening ***pill line***
**Rx#:**  202931-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 0 ML in 44 days

Insulin  Reg (10 ML) 100 UNITS/ML Inj
inject 5 units of regular insulin subcutaneously each evening ***pill line***
**Rx#:**  202930-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 0 ML in 44 days

Insulin  Reg (10 ML) 100 UNITS/ML Inj
Inject 11 u units of regular insulin subcutaneously each morning ***pill line***
**Rx#:**  202932-MCR      **Doctor:**  Cunnagin, Carrie DO
**Start:**  01/20/21      **Exp:** 01/20/22                  **Pharmacy Dispensings:** 0 ML in 44 days

| Complex: | MCR--MCCREARY USP | Begin Date: | N/A | End Date: | N/A |
|---|---|---|---|---|---|
| Inmate: | SELLS, MATTHEW | Reg #: | 28879-078 | Quarter: | A03-124U |

**Medications listed reflect prescribed medications from the begin date to end date on this report.**

**Allergies:** Denied

## Active Prescriptions

Losartan potassium 50 MG Tab
Take one tablet (50 MG) by mouth daily
**Rx#:** 202933-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 30 TAB in 31 days

metFORMIN HCl 1000 MG Tab
Take one tablet (1000 MG) by mouth two times a day -- start after the 7 days of 500 mg is completed
**Rx#:** 202934-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 60 TAB in 31 days

Vitamin A & D Ointment 60 GM
Apply a small amount topically to the affected area(s) twice daily feet **non-formulary approved until: 01/20/2023
**Rx#:** 203235-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 0 GM in 31 days

Insulin NPH (10 ML) 100 UNITS/ML INJ
inject 27 units of NPH insulin subcutaneously each morning ***pill line***
**Rx#:** 202929-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 0 ML in 31 days

Insulin NPH (10 ML) 100 UNITS/ML INJ
Inject 11 units of NPH insulin subcutaneously each evening ***pill line***
**Rx#:** 202931-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 0 ML in 31 days

Insulin Reg (10 ML) 100 UNITS/ML Inj
inject 5 units of regular insulin subcutaneously each evening ***pill line***
**Rx#:** 202930-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 0 ML in 31 days

Insulin Reg (10 ML) 100 UNITS/ML Inj
Inject 11 u units of regular insulin subcutaneously each morning ***pill line***
**Rx#:** 202932-MCR     **Doctor:** Cunnagin, Carrie DO
**Start:** 01/20/21     **Exp:** 01/20/22     Pharmacy Dispensings: 0 ML in 31 days

| Reg #: 28879-078 | Inmate Name: SELLS, MATTHEW |
|---|---|

| Description | Axis | Code Type | Code | Diag. Date | Status | Status Date |
|---|---|---|---|---|---|---|
| **Current** | | | | | | |
| Type 2 diabetes mellitus | | | | | | |
| 12/29/2020 08:02 EST Cunnagin, Carrie DO | | ICD-10 | E119 | 12/29/2020 | Current | |
| DKA 12/29/2020 per ER | | | | | | |
| 12/29/2020 07:47 EST Kenney, Pamela FNP | | ICD-10 | E119 | 12/29/2020 | Current | |
| DKA per ER | | | | | | |
| 12/29/2020 07:42 EST Kenney, Pamela FNP | | ICD-10 | E119 | 12/29/2020 | Current | |
| Encounter for exam for admission to prison without abnormal findings | | | | | | |
| 12/10/2020 11:41 EST Kenney, Pamela FNP | | ICD-10 | Z022 | 12/10/2020 | Current | |

Total: 2

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | |
|---|---|---|---|
| Inmate Name: SELLS, MATTHEW | | | Reg #: 28879-078 |
| Date of Birth: 09/26/1985 | Sex: M Race: BLACK | | Facility: MCR |
| Encounter Date: 01/20/2021 10:42 | Provider: Cunnagin, Carrie DO | | Unit: Z03 |

Chronic Care - Chronic Care Clinic encounter performed at Special Housing Unit.

**SUBJECTIVE:**

COMPLAINT 1     Provider: Cunnagin, Carrie DO

Chief Complaint: Chronic Care Clinic

Subjective:    + DM since 12/29/2020 hospital admission for DKA & new onset DM!
Meds include: NPH 27 u qam & 11 u qpm, REGULAR INSULIN 11 u qam & 5 u qpm, AND metformin 1000mg BID.
States:
AM BS's 80's-100's & PM BS's 110's-130's.
On Losartan for renal protection.
No N/T in H/F.
No amputations.
Last eye exam: is currently scheduled to see optometry.
12/29/2021 baseline A1C = 11.4 with a BLOOD SUGAR OF 1531!

Pain:    No

**Seen for clinic(s):** Diabetes

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 01/20/2021 | 10:47 MCR | 97.8 | 36.6 | | Cunnagin, Carrie DO |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 01/20/2021 | 10:47 | 71 | | | Cunnagin, Carrie DO |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 01/20/2021 | 10:47 MCR | 16 | Cunnagin, Carrie DO |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 01/20/2021 | 10:47 MCR | 133/88 | | | | Cunnagin, Carrie DO |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 01/20/2021 | 10:47 MCR | 100 | Room Air | Cunnagin, Carrie DO |

**Height:**

| Date | Time | Inches | Cm | Provider |
|---|---|---|---|---|
| 01/20/2021 | 10:47 MCR | 71.0 | 180.3 | Cunnagin, Carrie DO |

**Weight:**

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 01/20/2021 | 10:47 MCR | 236.0 | 107.0 | | Cunnagin, Carrie DO |

**ROS Comments**

No n/v/d/c.
No f/c/night sweats/cough.
Wt stable over the past yr.
No cp/sob/syncope.
No melena/hematochezia.

PHYSICAL EXAM:

Gen-A&O, NAD
Neck-supple
Eyes-fundi grossly normal
H-RRR
L-CTA
A-soft, NT, no palpable masses
LE's without edema. Normal monofilament in both feet. + DP pulses. + calluses on both feet...heels and 1st MTP joints.
No open sores.
Skin-VERY dry, scaly, ashy diffusely.
Gait-normal

## ASSESSMENT:

Type 2 diabetes mellitus, E119 - Current

## PLAN:

### New Medication Orders:

| Rx# | Medication | Order Date |
|---|---|---|
| | INsulin NPH - Human | 01/20/2021 10:42 |
| | **Prescriber Order:** 11 u Subcutaneously each evening x 365 day(s) Pill Line Only | |
| | Indication: Type 2 diabetes mellitus | |
| | INsulin REG - Human | 01/20/2021 10:42 |
| | **Prescriber Order:** 11 u Subcutaneously each morning x 365 day(s) Pill Line Only | |
| | Indication: Type 2 diabetes mellitus | |
| | Vitamin A & D Ointment | 01/20/2021 10:42 |
| | **Prescriber Order:** apply to both feet Topically - Two Times a Day x 365 day(s) | |
| | Indication: Type 2 diabetes mellitus | |

### Renew Medication Orders:

| Rx# | Medication | Order Date |
|---|---|---|
| 202455-MCR | Insulin NPH (10 ML) 100 UNITS/ML INJ | 01/20/2021 10:42 |
| | **Prescriber Order:** inject 27 units of NPH insulin subcutaneously each morning x 365 day(s) Pill Line Only | |
| | Indication: Type 2 diabetes mellitus | |
| 202458-MCR | Insulin Reg (10 ML) 100 UNITS/ML Inj | 01/20/2021 10:42 |
| | **Prescriber Order:** inject 5 units of regular insulin subcutaneously each evening x 365 day(s) Pill Line Only | |
| | Indication: Type 2 diabetes mellitus | |
| 202453-MCR | Losartan potassium 50 MG Tab | 01/20/2021 10:42 |
| | **Prescriber Order:** Take one tablet (50 MG) by mouth daily x 365 day(s) -- for renal protection | |
| | Indication: Type 2 diabetes mellitus | |
| 202459-MCR | metFORMIN HCl 1000 MG Tab | 01/20/2021 10:42 |
| | **Prescriber Order:** Take one tablet (1000 MG) by mouth two times a day -- start after the 7 | |

## Renew Medication Orders:

| Rx# | Medication | Order Date |
|---|---|---|
| | days of 500 mg is completed x 365 day(s) | |

Indication: Type 2 diabetes mellitus

## Discontinued Medication Orders:

| Rx# | Medication | Order Date |
|---|---|---|
| 202457-MCR | Insulin Reg (10 ML) 100 UNITS/ML Inj | 01/20/2021 10:42 |

Prescriber Order: *inject 11 units of NPH insulin subcutaneously each morning*

Discontinue Type: *When Pharmacy Processes*

Discontinue Reason: *Order changed*

Indication:

## New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests - Short List-General-CBC w/diff | One Time | 01/17/2022 00:00 | Routine |
| Lab Tests - Short List-General-Lipid Profile | | | |
| Lab Tests - Short List-General-Microalbumin, urine random | | | |
| Lab Tests - Short List-General-TSH | | | |
| Lab Tests - Short List-General-Hemoglobin A1C | | | |
| Lab Tests - Short List-General-Comprehensive Metabolic Profile (CMP) | | | |
|     Labs requested to be reviewed by: | Kenney, Pamela FNP | | |
| Lab Tests - Short List-General-Microalbumin, urine random | One Time | 05/24/2021 00:00 | Routine |
| Lab Tests - Short List-General-Hemoglobin A1C | | | |
|     Labs requested to be reviewed by: | Kenney, Pamela FNP | | |

Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Preventive Health Visit | 03/15/2021 00:00 | Nurse |
| Chronic Care Visit | 01/05/2022 00:00 | Physician 02 |

## Disposition:

Follow-up at Sick Call as Needed

Follow-up at Chronic Care Clinic as Needed

## Other:

CL2.

Labwork ordered.

Will order A&D ointment for his extremely dry feet.

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 01/20/2021 | Counseling | Diabetes Counseling | Cunnagin, Carrie | Verbalizes Understanding |
| 01/20/2021 | Counseling | Diabetic Foot Care | Cunnagin, Carrie | Verbalizes Understanding |
| 01/20/2021 | Counseling | Exercise | Cunnagin, Carrie | Verbalizes Understanding |

Inmate Name: SELLS, MATTHEW
Date of Birth: 09/26/1985
Encounter Date: 01/20/2021 10:42

Sex: M    Race: BLACK
Provider: Cunnagin, Carrie DO

Reg #: 28879-078
Facility: MCR
Unit: Z03

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 01/20/2021 | Counseling | Diet | Cunnagin, Carrie | Verbalizes Understanding |
| 01/20/2021 | Counseling | Plan of Care | Cunnagin, Carrie | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Cunnagin, Carrie DO on 01/20/2021 11:02

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: | SELLS, MATTHEW | | Reg #: | 28879-078 |
| Date of Birth: | 09/26/1985 | Sex: M Race: BLACK | Facility: | MCR |
| Encounter Date: | 01/04/2021 08:42 | Provider: Kenney, Pamela FNP | Unit: | Z03 |

Mid Level Provider - Medical Trip Return encounter performed at Special Housing Unit.

**SUBJECTIVE:**

COMPLAINT 1    Provider: Kenney, Pamela FNP

Chief Complaint: Medical Trip Return
Subjective: Inmate seen in SHU follow medical trip to LCRH for DKA
Pain: No

**ROS:**

General

Constitutional Symptoms

No: Anorexia, Chills, Easily Tired, Fatigue, Fever

Endocrine

General

Yes: Hx of Diabetes, Polydipsia, Polyuria

**OBJECTIVE:**

Temperature:

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 01/04/2021 | 08:43 MCR | 97.7 | 36.5 | | Kenney, Pamela FNP |

Pulse:

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 01/04/2021 | 08:43 | 107 | | | Kenney, Pamela FNP |

Respirations:

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 01/04/2021 | 08:43 MCR | 18 | Kenney, Pamela FNP |

Blood Pressure:

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 01/04/2021 | 08:43 MCR | 102/75 | | | | Kenney, Pamela FNP |

SaO2:

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 01/04/2021 | 08:43 MCR | 99 | | Kenney, Pamela FNP |

Weight:

| Date | Time | Lbs | Kg | Waist Circum. | Provider |
|---|---|---|---|---|---|
| 01/04/2021 | 08:43 MCR | 237.0 | 107.5 | | Kenney, Pamela FNP |

Exam:

General

Affect

Yes: Pleasant, Cooperative

Appearance

Yes: Appears Well, Alert and Oriented x 3

**Skin**

**General**

Yes: Within Normal Limits, Dry, Skin Intact

**Pulmonary**

**Observation/Inspection**

Yes: Within Normal Limits

**Auscultation**

Yes: Clear to Auscultation

**Cardiovascular**

**Observation**

Yes: Within Normal Limits, Normal Rate

**Auscultation**

Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

No: M/R/G

**Comments**

Inmate returns for LCRH after being admitted for DKA. He states he feels weak. Writer reviewed medications with inmate. Gave him ample time to ask questions. Will order labs for next two weeks. Will keep close eye on A1C. Discussed Diabetes, he thinks his father is diabetic. Inmate does not have any other medical problems that he can recall.

**ASSESSMENT:**

Type 2 diabetes mellitus, E119 - Current

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|
| | INsulin NPH - Human | 01/04/2021 08:42 |
| | **Prescriber Order:**   27 units Subcutaneously each morning x 180 day(s) Pill Line Only | |
| | Indication:  Type 2 diabetes mellitus | |
| | INsulin REG - Human | 01/04/2021 08:42 |
| | **Prescriber Order:**   11 units Subcutaneously each morning x 180 day(s) Pill Line Only | |
| | Indication:  Type 2 diabetes mellitus | |
| | INsulin NPH - Human | 01/04/2021 08:42 |
| | **Prescriber Order:**   11 units Subcutaneously each evening x 180 day(s) Pill Line Only | |
| | Indication:  Type 2 diabetes mellitus | |
| | INsulin REG - Human | 01/04/2021 08:42 |
| | **Prescriber Order:**   5 units Subcutaneously each evening x 180 day(s) Pill Line Only | |
| | Indication:  Type 2 diabetes mellitus | |
| | metFORMIN Tablets | 01/04/2021 08:42 |
| | **Prescriber Order:**   1000 mg Orally -  Two Times a Day x 180 day(s) -- start after the 7 days of 500 mg is completed | |
| | Indication:  Type 2 diabetes mellitus | |

**Discontinued Medication Orders:**

| Rx# | Medication | Order Date |
|---|---|---|

### Discontinued Medication Orders:

**Rx#**    **Medication**                                         **Order Date**

*202452-MCR*  *Insulin  NPH (10 ML) 100 UNITS/ML INJ*                     *01/04/2021 08:42*

                   **Prescriber Order:**  *inject 10 units of NPH insulin subcutaneously each evening*

                   Discontinue Type:  *When Pharmacy Processes*

                   Discontinue Reason: *discontinue*

                   Indication:

*202451-MCR*  *Insulin  NPH (10 ML) 100 UNITS/ML INJ*                     *01/04/2021 08:42*

                   **Prescriber Order:**  *inject 35 units of NPH insulin subcutaneously each morning*

                   Discontinue Type:  *When Pharmacy Processes*

                   Discontinue Reason: *discontinue*

                   Indication:

### New Laboratory Requests:

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Lab Tests - Short List-General-Hemoglobin A1C | One Time | 01/18/2021 00:00 | Routine |
| Lab Tests - Short List-General-Basic Metabolic Profile (BMP) | | | |

        Labs requested to be reviewed by:     Gomez, Kenneth MD

### Schedule:

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Chronic Care Visit | 01/13/2021 00:00 | Physician |
|    Will need enrolled in DM CCC | | |
| Optometry Exam | 06/11/2021 00:00 | Optometrist |
|    DM | | |

### Disposition:

Follow-up at Sick Call as Needed
Follow-up at Chronic Care Clinic as Needed

### Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 01/04/2021 | Counseling | Diagnosis | Kenney, Pamela | Verbalizes Understanding |
| 01/04/2021 | Counseling | Diabetes Counseling | Kenney, Pamela | Verbalizes Understanding |
| 01/04/2021 | Counseling | Access to Care | Kenney, Pamela | Verbalizes Understanding |
| 01/04/2021 | Counseling | Plan of Care | Kenney, Pamela | Verbalizes Understanding |
| 01/04/2021 | Counseling | New Medication | Kenney, Pamela | Verbalizes Understanding |

**Copay Required:** No       **Cosign Required:** Yes

**Telephone/Verbal Order:**  No

Completed by Kenney, Pamela FNP on 01/04/2021 08:54

Requested to be cosigned by  Gomez, Kenneth MD.

Cosign documentation will be displayed on the following page.

# Bureau of Prisons
# Health Services
# Cosign/Review

| | | | | | |
|---|---|---|---|---|---|
| Inmate Name: | SELLS, MATTHEW | | | Reg #: | 28879-078 |
| Date of Birth: | 09/26/1985 | Sex: | M | Race: | BLACK |
| Encounter Date: | 01/04/2021 08:42 | Provider: | Kenney, Pamela FNP | Facility: | MCR |

**Cosigned with New Encounter Note by Gomez, Kenneth MD on 01/04/2021 12:11.**

# Bureau of Prisons
# Health Services
# Clinical Encounter

| | | | | |
|---|---|---|---|---|
| Inmate Name: | SELLS, MATTHEW | | Reg #: | 28879-078 |
| Date of Birth: | 09/26/1985 | Sex: M Race: BLACK | Facility: | MCR |
| Encounter Date: | 12/29/2020 04:00 | Provider: Kenney, Pamela FNP | Unit: | C03 |

Mid Level Provider - Evaluation encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1      Provider: Kenney, Pamela FNP

Chief Complaint: Other Problem

Subjective: Inmate unresponsive when brought to medical unit.

**Pain:** No

**ROS:**

**General**

**Constitutional Symptoms**

No: Anorexia, Chills, Easily Tired, Fatigue, Fever

**OBJECTIVE:**

**Temperature:**

| Date | Time | Fahrenheit | Celsius | Location | Provider |
|---|---|---|---|---|---|
| 12/29/2020 | 07:25 MCR | 91.0 | 32.8 | | Kenney, Pamela FNP |

**Pulse:**

| Date | Time | Rate Per Minute | Location | Rhythm | Provider |
|---|---|---|---|---|---|
| 12/29/2020 | 07:25 | 86 | | | Kenney, Pamela FNP |

**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 12/29/2020 | 07:25 MCR | 26 | Kenney, Pamela FNP |

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 12/29/2020 | 07:25 MCR | 123/80 | | | | Kenney, Pamela FNP |

**SaO2:**

| Date | Time | Value(%) Air | Provider |
|---|---|---|---|
| 12/29/2020 | 07:25 MCR | 100 | Kenney, Pamela FNP |

**Exam:**

**General**

**Appearance**

Yes: Acutely Ill

No: Alert and Oriented x 3

**Cardiovascular**

**Observation**

Yes: Within Normal Limits, Normal Rate, Regular Rhythm

No: Tachycardia

**Auscultation**

Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

Inmate Name: SELLS, MATTHEW
Date of Birth: 09/26/1985
Encounter Date: 12/29/2020 04:00

Sex: M   Race: BLACK
Provider: Kenney, Pamela FNP

Reg #: 28879-078
Facility: MCR
Unit: C03

No: M/R/G

### ROS Comments

unresponsive

### Comments

Inmate brought to medical via wheel chair, not responding to verbal stimuli. Only responding to painful stimuli and ammonia caplet. Would briefly arouse and then go back to same unresponsive state. Vital signs stable, lips and mouth dry. Inmate moving air well, no signs of obstruction. Narcan given and no change. Spoke with MD, in agreement to send inmate to hospital for further evaluation. Report called to LCRH, KELLY in the ER.

## ASSESSMENT:

Type 2 diabetes mellitus, E119 - Current - *DKA per ER*

## PLAN:

**New Medication Orders:**

| Rx# | Medication | Order Date |
|-----|-----------|------------|
|  | Naloxone Hydrochloride Inj | 12/29/2020 04:00 |

    **Prescriber Order:**   0.4 mg Intramuscularly  One Time Dose Given PRN x 0 day(s) Pill Line Only

    Indication:   Type 2 diabetes mellitus

    Start Now:  Yes

        Night Stock Rx#:

        Source:  Pyxis

        Admin Method:  Pill Line

        Stop Date:  12/29/2020 03:30

        MAR Label:  0.4 mg Intramuscularly  One Time Dose Given PRN x 0 day(s) Pill Line Only

        One Time Dose Given:  Given Now

## Disposition:

Transfer to Local Hospital

## Other:

Update per ER, inmate in DKA

## Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 12/29/2020 | Counseling | Access to Care | Kenney, Pamela | Verbalizes Understanding |
| 12/29/2020 | Counseling | Plan of Care | Kenney, Pamela | Verbalizes Understanding |

**Copay Required:** No          **Cosign Required:** Yes

**Telephone/Verbal Order:**  No

Completed by Kenney, Pamela FNP on 12/29/2020 07:47

Requested to be cosigned by Cunnagin, Carrie DO.

Cosign documentation will be displayed on the following page.

## EXHIBIT 3:
- **Individualized Needs Plan**
- **Certificates of Achievements**



## Individualized Needs Plan - Program Review    (Inmate Copy)

SEQUENCE: 02217798
Team Date: 01-20-2021

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: SELLS, MATTHEW   28879-078

| | |
|---|---|
| Facility: | MCR MCCREARY USP |
| Name: | SELLS, MATTHEW |
| Register No.: | 28879-078 |
| Age: | 35 |
| Date of Birth: | 09-26-1985 |

| | |
|---|---|
| Proj. Rel. Date: | 07-01-2026 |
| Proj. Rel. Mthd: | GCT REL |
| DNA Status: | PREBOP TST / 07-21-2020 |

### Detainers

| Detaining Agency | Remarks |
|---|---|

*NO DETAINER*

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| MCR | A&O | ADMISSIONS & ORIENTATION | 01-01-2021 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| MCR | ESL HAS | ENGLISH PROFICIENT | 12-14-2020 |
| MCR | GED EN | ENROLL GED NON-PROMOTABLE | 12-15-2020 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|

*NO COURSES*

### Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|---|---|

*** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS ***

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 12-08-2020 |
| SCRN2 | CCM: STABLE CHRONIC CARE | 07-21-2020 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| C19-QUAR | COVID-19 QUARANTINED | 12-17-2020 |
| C19-T NEG | COVID-19 TEST-RESULTS NEGATIVE | 12-19-2020 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 12-10-2020 |
| YES F/S | CLEARED FOR FOOD SERVICE | 12-10-2020 |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED WAIT RJ | DRUG EDUCATION WAIT-RQ JUDREC | 12-07-2020 |

### FRP Details

| Most Recent Payment Plan |
|---|

*** NO FRP DETAILS ***

### Progress since last review

| ARRIVED ON 12/4/2020 |
|---|

### Next Program Review Goals

| ENROLL INTO THE GED PROGRAM; ENROLL INTO MONEY SMART; ENROLL INTO 3 SELF STUDY COURSES; AND ENROLL INTO THE CHALLENGE PROGRAM |
|---|

### Long Term Goals

| COMPLETE 2 VT COURSES<br>COMPLETE RPP COURSE<br>EARN YOUR GED<br>COMPLETE CHALLENGE PROGRAM |
|---|

### RRC/HC Placement

 **Individualized Needs Plan - Program Review** **(Inmate Copy)**  SEQUENCE: 02217798
Dept. of Justice / Federal Bureau of Prisons  Team Date: 01-20-2021
Plan is for inmate: SELLS, MATTHEW  28879-078

| No. |
| --- |
| Management decision - UT WILL REVIEW 17-19 MONTHS PRIOR TO RELEASE. |

## Comments

| |
| --- |
| ** No notes entered ** |



# CERTIFICATE *of* ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Matthew Sells

HAS SUCCESSFULLY COMPLETED THE

Athletes and Efficient Hearts Study Course

FEBRUARY 25TH,
2021



D. **BOWEN** , *Recreation Specialist*, USP McCreary KY



# CERTIFICATE *of* ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Matthew Sells

HAS SUCCESSFULLY COMPLETED THE

Cardiorespiratory Endurance Study Course

MARCH 29TH,
2021

D. BOWEN , *Recreation Specialist*, USP McCreary KY



MATTHEW SELLS
REG. NO. 28879-078
USP MCCREARY
U.S. PENITENTIARY
P.O. BOX 3000
PINE KNOT, KY 42635

July 22, 2021

Mr. David A. O'Toole
Clerk of Court
U.S. District Court
Eastern District of Texas
Beaumont Division
300 Willow Street
Beaumont, TX 77701

  RE: *Sells v. United States*
     Crim No. 1:19-cr-00139-MAC-KFG-1

Dear Mr. O'Toole:

  Enclosed please find and accept for filing Movant's Motion for Compassionate Release/Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018. Please submit this document to the Court.

  Thank you for your assistance in this matter.

        Sincerely,

        MATTHEW SELLS
        Appearing *Pro Se*

*Encl. as noted*

PRESS FIRMLY TO SEAL

PRIORITY MAIL
FLAT RATE ENVELOPE
REQUIRED

**US POSTAGE PAID**

**$7.95**

Origin: 77070
07/22/21
4800420059-05

## PRIORITY MAIL 2-DAY®

0 Lb 8.80 Oz

**1006**

EXPECTED DELIVERY DAY: 07/26/21

C060

SHIP
TO:
300 WILLOW ST
Beaumont TX 77701-2222

### USPS TRACKING® #



9505 5104 4804 1203 5955 21

- Expected de
- Most domes
- USPS Tracki
- Limited inter
- When used i

*Insurance does n
Domestic Mail Ma
** See Internationa

(ions apply).*

stinations.

the

of coverage.

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

# TRACKED ■ INSURED



PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

FROM:

MATTHEW SELLS
REG. NO. 28879-078
USP MCCREARY
U.S. PENITENTIARY
P.O. BOX 3000
PINE KNOT, KY 42635

CLERK, U.S. DISTRICT COURT
RECEIVED

JUL 2 3 2021

EASTERN DISTRICT OF TEXAS
BEAUMONT, TEXAS

TO:
Mr. David A. O'Toole
Clerk of Court
U.S. District Court
Eastern District of Texas
Beaumont Division
300 Willow Street
Beaumont, TX 77701

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments.
Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020; All rights reserved.